IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| KENNETH LEE BELL,<br><br>                Plaintiff<br>     VS.<br><br>DR. OKUWOBI, *et al.*,<br><br>                Defendants | NO. 5:04-CV-18 (WDO)<br><br>PROCEEDINGS UNDER 42 U.S.C. § 1983<br>BEFORE THE U. S. MAGISTRATE JUDGE |

## RECOMMENDATION

Plaintiff KENNETH LEE BELL is an inmate in the custody of the State of Georgia. He has sued defendants DR. OKUMOBI, DR. HARRIS, P.A. HERMAN, and P.A. SINCLAIR, alleging that the defendants violated his constitutional rights while he was incarcerated at Telfair State Prison in Helena, Georgia, and Bostick State Prison in Hardwick, Georgia. Plaintiff claims he was not properly treated for his Hepatitis C infection. He also claims that he was not given the proper medication and pain relief for the side effects from the treatment that he did receive. Plaintiff BELL is represented by legal counsel.

Before the court are the defendants' **MOTIONS FOR SUMMARY JUDGMENT**. Tabs #21 and #35. The motions are supported by briefs (Tabs #22 and #38), affidavits, medical records, and a Statement of Undisputed Material Facts (Tab #23). The court advised the plaintiff of these motions and of his duty to respond properly thereto. Tabs #22 and #36. The plaintiff has filed Responses to the defendants' motions (Tabs #33 and #40), supporting briefs (Tabs #34 and #41), and a Statement of Disputed Material Facts (Tab #42). The defendants have filed a Reply to the plaintiff's Response (Tab #46).

After the undersigned issued an Order admitting the affidavit of Dr. William S. Thompson only for issues affecting the severity of Hepatis C (HCV) but not as an expert with respect to its treatment (Tab #61), the plaintiff requested a continuance in order to obtain an expert opinion on HCV and submit another response to the defendants' Motions for Summary Judgment. Tab #62. On May 23, 2006, the undersigned issued a thirty day continuance (Tab #64), and that time has expired without plaintiff's submitting an additional Response. In entering this recommendation, the undersigned has carefully considered the defendants' motions and all attachments thereto, as well as the plaintiff's responses and supporting documentation.

## LEGAL STANDARDS
### A. Summary Judgment

Rule 56 of the *Federal Rules of Civil Procedure* dealing with motions for summary judgment provides as follows:

> The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Summary judgment can only be granted if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c); Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). While the evidence and all factual inferences therefrom must be viewed by the court in the light most favorable to the party opposing the motion, the party opposing the granting of the motion for summary judgment cannot rest on his pleadings to present an issue of fact but must make a response to the motion by filing affidavits, depositions, or otherwise in order to persuade the court that there are material facts present in the case which must be presented to a jury for resolution. *See Van T. Junkins & Assoc. v. U.S. Industries, Inc.*, 736 F.2d 656, 658 (11th Cir. 1984).

Specifically, the party seeking summary judgment bears the initial burden to demonstrate to the court the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show that there is an absence of any genuine issue of material fact. *Hairston v. The Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1998). In determining whether the moving party has met this burden, the court must review the evidence and all factual inferences drawn from this, in the light most favorable to the non-moving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

If the moving party successfully meets this burden, the burden then shifts to the non-moving party to establish by going beyond the pleadings, that there are genuine issues of material fact to be resolved by a fact-finder. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Genuine issues are those as to which the evidence is such that a reasonable jury could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).[1]

## B. Deliberate Indifference

In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, rehearing denied 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1976). However, the course of treatment is "a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. A mere disagreement between a prisoner and prison officials as to diagnosis or treatment does not give rise to a constitutional violation. *Id.* at 106. The Eleventh Circuit has refined *Estelle* as follows with respect to delay in medical treatment:

> Delay in access to medical attention can violate the Eighth Amendment when it is tantamount to unnecessary and wanton infliction of pain. Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to lay persons because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem. In contrast, delay or even denial of medical treatment for superficial, nonserious physical conditions does not violate the Eighth Amendment.
>
> The seriousness of an inmate's medical needs may be decided by reference to the effect of the delay in treatment. Where the delay results in an inmate's suffering a life-long handicap or permanent loss, the medical need is considered serious. An inmate who complains that delay in medical treatment rose to a constitutional violation must place <u>verifying medical evidence in the record</u> to establish the detrimental effect of delay in medical treatment to succeed. Further, the tolerable length of the delay in providing medical attention depends on the nature of the medical need and the reason for the delay. Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay. *Hill v. Dekalb R.Y.D.C.*, 40 F.3d 1176, 1187-88 (11th Cir.1994) *abrogated on other grounds by Hope v. Pelzer,* 536 U.S. 730 (2002) (internal citations and punctuation omitted).

---

[1] *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (the purpose of summary judgment is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial); *Brown v. City of Clewiston*, 848 F.2d 1534, 1543 (11th Cir. 1988) (the question is whether the record as a whole could lead a rational trier of fact to find for the nonmovant).

## DISCUSSION
### Undisputed Facts

Upon review of the entire record, the undersigned recommends the following findings of fact as undisputed:

On August 21, 2001, plaintiff's incarceration began at Georgia Diagnostic and Classification Prison. That day, blood was drawn for a CBC, HIV, RPR, and Chemistry after plaintiff signed the consent to treatment form. Tests showed that plaintiff had a elevation of the LDL which was not relevant to his liver condition. His fasting blood sugars, total protein, and ALT levels were also noted to be minimally elevated. All other areas were within normal limits. It was noted that plaintiff required no treatment at that time. Tab #22, medical records pp. 1-5.

Plaintiff underwent a physical on August 29, 2001. His medical history was reviewed, his blood pressure was noted to be 117/80, his heart rate was 69, and his weight was 165. His lab results were also discussed with him. Plaintiff was placed on a low cholesterol, low salt diet. All of his medications were continued; however, his dosage of Lotensin was lowered. He was further educated to stop smoking. *Id*. at 6. Plaintiff had blood drawn for a second time on September 4, 2001. He was negative for Hepatitis A and B, but positive for type C. Further evaluation was recommended. *Id*. at 7-11.

On September 11, 2001, plaintiff had another physical at which he voiced no complaints. His lab results and positive test for Hepatitis C were discussed with him. He was advised of the risks and he was given a handbook on Hepatitis C. A consultation request for a GI telemedicine session was placed that day. The request was approved by Utilization Management (UM) on September 16, 2001. An appointment was then set up for plaintiff on December 3, 2001. *Id*. at 12-16. Plaintiff's chart was reviewed on December 28, 2001, and it was noted that he would need to be brought to the medical on a regular basis for his Hepatitis treatment. His medications were renewed and lab work was ordered in order to monitor his condition. *Id*. at 17-19. Plaintiff's chart was again reviewed on February 1, 2002, and a checklist of criteria that were met before treatment was begun was prepared. Plaintiff also received a mental health evaluation because Hepatitis treatment can aggravate some mental health problems. *Id*. at 20.

4

Plaintiff was seen via telemedicine by Dr. Urias Cuartas on February 4, 2002, and a decision was made that plaintiff would undergo a liver biopsy. He was then placed on new medications and given instructions. Plaintiff's liver biopsy was initially scheduled for June 3, 2002, but was changed to August 8, 2002, due to the extensive testing that precedes a liver biopsy. *Id*. at 21-22.

Plaintiff had a follow-up medical appointment on February 7, 2002, after his telemedicine session with Dr. Cuartas. There were no changes in his symptoms and no problems were reported. A routine GI consultation was requested and approved. Plaintiff's lab work was reviewed and noted to be within an acceptable range. He was placed on a low fat, low cholesterol diet. It was also noted that plaintiff continued to smoke against orders. *Id*. at 23-26.

Plaintiff again had blood drawn on February 13, 2002. The results showed that his cholesterol and glucose were still minimally elevated, but his LDL was within normal limits. Minimal elevations of AST and ALT were noted. *Id*. at 27-28.

Plaintiff was next seen at medical on February 22, 2002, to monitor his Hepatitis and hypertension. His abnormal labs were noted and his HCV was stable. His abdomen was soft and not enlarged which indicated that he was not having any problems, but his liver functions were slightly elevated. Lab tests and a urinalysis to test his liver function were scheduled. Plaintiff was advised to drink more water, to exercise, to eat more vegetables, and to stop smoking. *Id*. at 29.

On April 23, 2002, plaintiff was seen in medical. His consult was discussed with him, and it was explained why it was taking longer to have his procedure. Plaintiff voiced his understanding. *Id*. at 30.

Plaintiff's chart was reviewed May 6, 2002, and it was noted that his Non-Steroidal Anti-inflammatory Drugs (NSAIDs) were to be discontinued later that month to avoid bleeding during surgery. However, on May 22, 2002, the staff was notified not to discontinue plaintiff's medication until August 2, 2002. *Id*. at 31-32.

On May 22, 2002, plaintiff had another comprehensive metabolic panel run to test his AST and ALT levels. The results were discussed with plaintiff on June 5, 2002, when he was again educated to stop smoking. It was noted that the plan was to continue plaintiff on his medications for another thirty days. Additionally, more lab work was ordered in preparation for his biopsy. *Id*. at 33-35.

5

Plaintiff was seen at the medical clinic at Telfair State Prison on June 17, 2002, for complaints of headaches and right side pain. He was given Motrin and Ibuprofen. He was also referred to defendant Okuwobi who discussed plaintiff's condition and biopsy with him. He also instructed plaintiff to drink fluids. *Id*. at 36-37.

Plaintiff's chart was reviewed on July 30, 2002. His low-fat, low-cholesterol diet was discontinued due to non-compliance. Plaintiff also had blood drawn for more tests. Results showed modest elevations in the AST and ALT levels. *Id*. at 38-42

Plaintiff had a second telemedicine conference with Dr. Cuartas on August 4, 2002. It was noted that his biopsy had been scheduled. The procedure and follow-up therapy was explained to him. *Id*. at 43.

On August 6, 2002, plaintiff was transferred to Augusta State Medical Prison (ASMP) for his liver biopsy. The procedure was uneventful. Following the surgery, plaintiff was given pain medications. He was discharged on August 13, 2002, with instructions to continue his medications and to follow-up in the GI clinic. *Id*. at 44-49.

The results of plaintiff's liver biopsy showed mild chronic Hepatitis C. Fibrosis was noted to be at Stage 2, and inflammatory activity was mild. These findings indicated that plaintiff had two additional stages of fibrosis to go through before reaching the cirrhosis range. The biopsy also showed that plaintiff's Hepatitis genotype was 1a, which is resistant to treatment. *Id*. at 48-49.

On August 14, 2002, plaintiff was sent back to the general population. He was given profiles for a bottom bunk, no heavy lifting, and no strenuous activity for two weeks. That same day, plaintiff had a follow-up appointment with Dr. Cuartas. He was placed on a regimen of Intron, three million units, three times per week, and Ribavirin, 600 mg orally, to last for one year unless found by the physicians to be ineffective. Plaintiff signed the consent form for Hepatitis treatment. He was also scheduled for CBC's weekly for the following six weeks and all his medications were continued. *Id*. at 50-54, 67.

Plaintiff had a follow-up appointment on August 21, 2002. He was noted to be stable and his liver function was improving. It was noted that his viral load was low, which was a good sign. Plaintiff agreed to comply with his Hepatitis treatment for one year. A consultation request was placed and scheduled for 6-8 weeks. *Id*. at 53-56.

On September 10, 2002, plaintiff was seen in the chronic care clinic. His HCV and side effects were noted as being stable. His treatment was continued for 90 days and he was educated as to the risks of smoking. Lab work was ordered to monitor his condition. The next day, plaintiff had blood drawn for a CBC. The report showed that his HCA RNA had increased from August 13, 2002. *Id*. at 68-70.

In October and November of 2002, plaintiff cancelled his sick call appointments but he did go to his telemedicine appointment with Dr. Cuartas on November 18, 2002. Dr. Cuartas informed plaintiff that he was to continue with treatment for another two months. He was also give a no wellness walk profile for 6 months. He was again advised to stop smoking. *Id*. at 56, 74, 77-81, 83-84.

Plaintiff had blood drawn on November 27, 2002. Results showed that his red blood cell count, hemoglobin, and hematocrit were low. This was noted to be normal as plaintiff was on Ribavirin therapy. His liver function test were normal. *Id*. at 82.

Plaintiff was seen for complaints of a rash on December 3, 2002. It was explained to him that the rash was a side effect of his Hepatitis treatment. He was told not to scratch, to use the cream he was given, and to avoid hot showers. Plaintiff was also given Dove soap and Lubriderm to help with the rash. The next day, plaintiff was seen by defendant Okuwobi regarding his rash. Physical examination showed that the rash was typical of Hepatitis treatment, but there was some sign of Herpes infection. Plaintiff was told to stop using Vanceril until the rash went away because it could make it worse. He was instructed to keep the area clean and dry and was given 325mg of Tylenol every eight hours for three days, *Id*. at 85-88.

Plaintiff had additional blood work done on December 5, 2002. CBC results showed a lower than normal red blood cell count, hemoglobin, and hematocrit due to his Hepatitis treatment. *Id*. at 89-90.

On December 13, 2002, plaintiff was seen in the chronic care clinic. His HCV was noted to be under a good degree of control and his condition was stable. Physical examination showed no significant changes and he was to continue his therapy and medications. *Id*. at 91, 93-96.

7

Plaintiff had blood drawn on December 13, 2002. There were no significant changes other than an improvement in his hemoglobin. *Id*. at 92.

On January 6, 2003, plaintiff again had blood drawn. His ALT and AST levels were noted to be in the normal range. However, his viral load was still detectable even though he was on Interferon and Ribavirin treatment. Plaintiff was continued on his treatments. *Id*. at 97, 99.

Plaintiff had a GI appointment at ASMP with Dr. Cuartas January 13, 2003. Dr. Cuartas recommended that plaintiff's labs be repeated and that he continue with his treatment. Three days later, he had a follow-up appointment at Telfair State Prison medical department. He stated that he felt well. Physical examination showed that plaintiff had gained some weight. Plaintiff was educated as to a proper diet and instructed to walk and to comply with all other medications. A GI consult was requested. *Id*. 98, 100-101.

On February 12, 2003, plaintiff had additional lab work. His Hepatic Function Panel showed that his proteins were now in range. Also, the CBC showed that is hemoglobin had risen. A month later, the same tests were run on plaintiff. Plaintiff's proteins were again noted to be in range, but it was noted that the Hepatitis treatment was failing as a viral load was still detectable. *Id*. at 105-110.

On March 26, 2003, plaintiff was seen in the chronic care clinic where it was noted that his Hepatitis was stable and under good control. His HCV-RNA range was noted and plaintiff was placed on Herpes medication because Hepatitis patients are very susceptible to Herpes. Plaintiff was further advised to stop smoking. *Id*. at 112, 114.

Plaintiff again had blood drawn on March 31, 2003. His red blood cell count, hemoglobin, and hematocrit were noted to be higher but still somewhat below normal levels. *Id*. at 113.

On April 9, 2003, plaintiff was seen by Dr. Cuartas who noted that plaintiff was a non-responder to Hepatitis treatment. It was recommended that plaintiff's Hepatitis treatment be discontinued due to a lack of success. However, Dr. Cuartas did recommend that plaintiff continue taking vitamins, and using lotions and soap. Plaintiff verbalized that he understood all of this. *Id*. at 115.

Plaintiff was seen at Telfair State Prison medical clinic for a follow-up on April 11, 2003. He stated that he was fine. His lack of response to Hepatitis treatment was noted. This was discussed with plaintiff and he again voiced his understanding. *Id*. at 116-117.

Plaintiff was seen at medical on April 29, 2003, for complaints of right side pain and lingering pain from his rash. He was advised to stop smoking and to increase his fluid intake. He was also prescribed pain medication and a lumbar x-ray was ordered. The results were normal. *Id*. at 118-119.

On April 30, 2003, plaintiff was to begin his Hepatitis B vaccination but he refused, stating that he did not want to release the Department of Corrections from responsibility for any drug reactions. Plaintiff had blood drawn that same day which showed that his red blood cell count, hemoglobin, and hematocrit were below normal. *Id*. at 120, 123.

Plaintiff was transferred to Bostick State Prison (Bostick) on May 12, 2003. His medications and chronic care clinics were all noted. At intake he was noted to not have any urgent health problems and was given a health services handout and orientation. *Id*. at 126.

On May 20, 2003, plaintiff was seen at the Bostick medical clinic. It was noted that his rash had cleared up . His vitamins, folic acid, Colace, Benadryl, and salsalate were discontinued despite the fact that he had been given a thirty day prescription for these items on May 13, 2003. All other medications and profiles were renewed. He was also give a ten day prescription for Tylenol. *Id*. at 127-130.

On May 30, 2003, plaintiff was seen for complaints of back ache and a ruptured disc. At that time, he made no complaints about any side effects from the Hepatitis treatment. He was given Percogesic for pain. Plaintiff returned to medical with the same complaints two days later. He was again given Percogesic, but his request for a lower bunk profile was denied as unnecessary. *Id*. at 131-132, 138.

Plaintiff had lab work done on June 18, 2003. The lipid panel revealed high triglycerides, but his cholesterol was in range as was his red blood cell count, hemoglobin, hematocrit, MCHC, RDW, and MCV, but his glucose, ALT, and AST were all slightly elevated. *Id*. at 133-134.

Plaintiff's viral load was still reported as detectable on June 23, 2003. He was examined that same day and voiced no complaints. He was seen again the next day, and it was noted that his Hepatitis was under a fair degree of control. His lab results were discussed with him and a Hepatitis panel was ordered. *Id*. at 135-137.

On August 20 and 21, 2003, plaintiff was seen by a nurse for complaints of abdominal pain. He also requested that he be given his vitamins and lotion. The nurse noted his previous lab results and lack of response to hepatitis treatment. Plaintiff was given a two week prescription for Tylenol, Vitamin C, E, and folic acid. The nurse promised plaintiff she would ask the doctor about reinstating his vitamins and lotions. When plaintiff went to sick call a week later, he refused his medications. *Id*. 144-148.

Plaintiff was seen at sick call on September 8, 2003, for continued complaints of back pain. At that time, he did not ask for the medications that he had refused. After an examination, his dosage of Ibuprofen was increased, and he was given a profile for a bottom bunk for one month. *Id*. at 148-149.

Plaintiff was next seen at medical on September 23, 2003, for complaints of stomach pain. He was educated as to the effects of medicine with a Hepatitis infection. He was advised to take the Tylenol as needed. *Id*. at 150.

Plaintiff had blood work performed on September 27, 2003. His red blood cell count, proteins, hemoglobin, hematocrit, MCH, MCV, MCHC, and RDW were all in range, but his ALT and AST were still slightly elevated. *Id*. at 151-152.

Plaintiff complained of back and joint pain while at medical on October 9, 2003. The effects of taking medication with a Hepatitis infection were again explained to him. *Id*. at 153.

On October 16, 2003, plaintiff returned to the clinic. At that time, he had no complaints. His Hepatitis status was noted as being under a good degree of control, and the physical examination showed no tenderness in his liver area. He was again advised to stop smoking. *Id*. at 154.

Plaintiff was seen for stomach pain on October 20 and 22, 2003. He also reported a tingling when he urinated. Physical examination showed mild tenderness. A urinalysis was ordered and plaintiff was given pain medication. Plaintiff's profile was changed to a moderate activity. His Hepatitis, mode of transmission, and course of illness were again explained to him. Further, he was once again advised to stop smoking. *Id.* at 155-156.

Plaintiff had blood drawn on December 22, 2003. His glucose was high and he continued to test positive for Hepatitis C. *Id.* at 160-161.

Dr. Hall examined plaintiff on January 9, 2004. Plaintiff stated that he was okay, but wanted his Hepatitis treatment restarted. Dr. Hall then began an evaluation for pegylated Interferon treatment. The infectious disease consultation was approved on January 15, 2004. *Id.* at 163-166.

On January 20, 2004, plaintiff consented to having the Hepatitis B vaccine. He was given his first injection on that date and his second on February 25, 2004. *Id.* at 167-168, 170.

Plaintiff was next seen at medical on March 15, 2004. His past lab work was explained to him and his pending infectious disease consult was noted. *Id.* at 171.

Dr. Richard Presnell, an infectious disease doctor, examined plaintiff on March 18, 2004. It was recommended that plaintiff complete the vaccination for Hepatitis A and B, but Interferon treatment was not recommended as it was essentially the same treatment he had failed to respond to previously. It was also noted that plaintiff needed to wait for more effective Hepatitis treatments to come out. This was explained to plaintiff and he voiced his understanding. *Id.* at 164-166.

Plaintiff had a follow-up appointment on March 25, 2004. He voiced no complaints except that he was itchy. He was given a prescription for Benadryl. *Id.* at 172-173.

**Facts in Dispute**

A. Expert Testimony

Before the court is the expert opinion of Dr. Joseph Paris, a recognized expert in the field of Hepatitis C treatment. Although plaintiff BELL disputes this opinion, he has provided no expert opinion to counter Dr. Paris' opinion. As such, the defendants' expert's testimony will be taken as true.

Although plaintiff BELL, without a supporting expert opinion, has averred that it is not possible for HCV to be under control if it is detectable, based upon the opinion of defendants' expert, the undersigned finds that his HCV *was* in control even though there were traces of the virus detectable in the blood.

The plaintiff, citing no expert authority, indicates that since the exact date of his infection with HCV is not known, it is possible that he could already have been infected with HCV for twenty years and thus prone for serious complication. Based on the early stage and mild nature of the plaintiff's chronic Hepatitis C Fibrosis and the mild inflammatory activity of the plaintiff's liver, the defendants' expert concluded that the plaintiff's condition is up to 24 years away from supervention of cirrhosis and complications.

The plaintiff opines that he should have been offered Hepatitis A and B vaccines when he was found to be HCV positive and HBV negative, six months before he was actually offered those vaccines. However, he presents no expert opinion to support this contention.

### B. Other disputed facts

The plaintiff avers that although his regimen of Inteferon plus Ribavirin was to last for a year unless clinicians found it to be ineffective, the medical records show that he only received these medications for 24 weeks. The defendants state only that the therapy was slated to continue for one year but make no mention of its discontinuation.

### EXPERT TESTIMONY

After reviewing the plaintiff's entire medical record, Dr. Joseph Paris – a recognized expert in the field of Hepatitis C treatment – concluded that

> *During his incarceration, Bell received ample and sufficient medical care and attention . . . Bell received appropriate care to contemporary standards regardless of cost. . . The medical care afforded to Bell equals or exceeds the standard of care that would be exercised by other physicians for similar conditions. No member of the GDC staff or contract staff involved in Bell's care ever acted deliberately in an indifferent manner to Bell's serious medical needs.* Deposition of Dr. Joseph Paris, Tab #22 , Attachment #1 at ¶80.

## CONCLUSIONS

In light of the above, it is the undersigned's view that the plaintiff has failed to establish that there is a issue of material fact to be tried with respect to the treatment of his Hepatitis C condition. Based on the medical records and the sworn testimony of Dr. Paris, which is consistent therewith, the undersigned finds that the defendants were not deliberately indifferent to plaintiff Bell's medical needs with respect to his Hepatitis C. Additionally, since the plaintiff does not allege that he contracted Hepatitis A or B, any delay in his receiving those vaccines is not actionable.

Accordingly, IT IS RECOMMENDED that the defendants' MOTIONS FOR SUMMARY JUDGMENT (Tab #21 & #35) be **GRANTED.** Pursuant to 28 U.S.C. §636(b)(1) the parties may serve and file written objections to this RECOMMENDATION with the district judge to whom the case is assigned **WITHIN TEN (10) DAYS** after being served with a copy thereof.

SO RECOMMENDED, this 24th day of JULY, 2006.



CLAUDE W. HICKS, JR.
UNITED STATES MAGISTRATE JUDGE